

**CLOSED**
**CIVIL**
**CASE**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 97-8273-CIV-LENARD

CARNIVAL BRAND SEAFOOD COMPANY,

    Plaintiff,

vs.

CARNIVAL BRANDS, INC.,

    Defendant.

_____/



FILED by _____ D.C.

DEC 3 1 1997

CARLOS JUENKE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

### FINAL SUMMARY JUDGMENT

**THIS CAUSE** came before the Court on Defendant's Motion to Dismiss Complaint or in the Alternative for Summary Judgment (DE6). The Court has considered the motion, and otherwise advised in the premises, finds as follows.

## I. INTRODUCTION

Plaintiff Carnival Brand Seafood Company filed this action against Defendant Carnival Brands, Inc. on April 18, 1997, and alleged claims for trademark infringement and false designation of origin pursuant to 15 U.S.C.A. § 1114 (West 1997), 15 U.S.C.A. § 1125 (West 1982 & Supp. 1997), and common law. Specifically, The Plaintiff alleges that the Defendant's use of the "Carnival" mark in its sale of its products, some

of which contain seafood ingredients, infringes the Plaintiff's statutory and common law rights in the mark. (Compl. ¶ 11.)  The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.A. § 1338 (West 1993). Before the Court is Defendant's Motion to Dismiss Complaint or in the Alternative for Summary Judgment, filed June 23, 1997. In the motion, the Defendant asks the Court to find that the Plaintiff has failed to state claims upon which relief can be granted for trademark infringement and false designation of origin.  In the alternative, the Defendant requests that the Court find as a matter of law that the Plaintiff cannot produce facts which support its claims, and that therefore, summary judgment is properly entered for the Defendant.  The Plaintiff objects to the relief sought by the Defendant.

## II.  STANDARD ON MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT

A complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts that would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  When ruling on a motion to dismiss, a court is required to view the complaint

in the light most favorable to the plaintiff.  Scheuer v.
Rhodes, 416 U.S. 232 (1974).  Dismissal is only appropriate
when it is clear to the court that no set of facts would
consistently support the allegations asserted in the
complaint.  H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S.
229, 250 (1989) (citing Hishon v. King & Spaulding, 467 U.S.
69 (1984)).

On a motion for summary judgment, however, the court is
to construe the evidence and factual inferences arising
therefrom in the light most favorable to the nonmoving party.
Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).
Summary judgment can be entered on a claim only if it is shown
"that there is no genuine issue as to any material fact and
that the moving party is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(c).  The Supreme Court explained the
summary judgment standard as follows:

> [T]he plain language of Rule 56(c) mandates the
> entry of summary judgment, after adequate time for
> discovery and upon motion, against a party who
> fails to make a showing sufficient to establish the
> existence of an element essential to that party's
> case, and on which that party will bear the burden
> of proof at trial.  In such a situation, there can
> be no genuine issue as to any material fact, since

3

a complete failure of proof concerning an essential
element of the non-moving party's case necessarily
renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The

trial court's function at this juncture is not "to weigh the

evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

A dispute about a material fact is genuine if the evidence is

such that a reasonable jury could return a verdict for the

nonmoving party. Anderson, 477 U.S. at 248; see also Barfield

v. Brierton, 883 F.2d 923, 933 (11th Cir. 1989). The party

asking for summary judgment "always bears the initial

responsibility of informing the district court of the basis

for its motion, and identifying those portions of the

'pleadings, depositions, answers to interrogatories, and

admissions of file, together with affidavits, if any,' which

it believes demonstrate the absence of a genuine issue of

material fact." Celotex, 477 U.S. at 323. Once this initial

demonstration under Rule 56(c) is made, the burden of

production, not persuasion, shifts to the non-moving party.

4

The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324; see also Fed. R. Civ. P. 56(e). In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Matsushita, 475 U.S. at 587. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita, 475 U.S. at 587. See also Anderson, 477 U.S. at 249.

## III. **ANALYSIS**

In Tally-Ho, Inc. v. Coast Community College District, 889 F.2d 1018 (11th Cir. 1989), the court summarized general principles of trademark law: "Under the common law, trademark rights are appropriated only through actual prior use in

commerce."   889   F.2d   at   1022   (citing   <u>United   States   v.</u>
<u>Steffens</u>, 100 U.S. 82 (1879);  J. Thomas McCarthy, <u>McCarthy on</u>
<u>Trademarks  and  Unfair  Competition</u>  §  16:1,  at  720  (2d  ed.
1984)).    "Trademark   ownership   is   always   appurtenant   to
commercial  activity.    Thus,  actual  and  continuous  use  is
required  to  acquire  and  retain  a  protectible  interest  in  a
mark."  889 F.2d at 1022-23 (footnote omitted).  The <u>Tally-Ho</u>
court  stated  further:  "Ownership  of  a  distinctive  mark  is
further limited by priority of use.  The first to use a mark
on a product or service in a particular geographic market, the
senior  user,  acquires  rights  in  the  mark  in  that  market."   889
F.2d at 1023 (citing <u>Junior Food Stores of W. Fla. v. Junior</u>
<u>Food Stores, Inc.</u>, 226 So. 2d 393, 396 (Fla. 1969)).  "Junior
users,  who  subsequently  use  the  same  or  similar  mark  on
similar products or services, may also establish common law
rights  to  perhaps  even  the  same  mark  provided  there  is  no
competitive overlap with the senior user."  <u>Id.</u> (citing <u>Junior</u>
<u>Food</u>, 226 So. 2d at 398).   "The senior user, however, may
enjoin such uses that infringe upon its prior rights, [which]

. . . may extend into uses in 'related' product or service markets (termed the 'related goods' doctrine)." Id. (citing J. McCarthy, § 24-1 to -12).

> Thus, an owner of a common law trademark may use its mark on related products or services and may enjoin a junior user's use of the mark on such related uses. The doctrine "gives the trademark owner protection against the use of its mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner."

Id.

### A.   Actual and Continuous Use

The Defendant argues that the Plaintiff cannot show that it has rights in the "Carnival" mark which were acquired through such actual and continuous use in commerce.   The Plaintiff is a Delaware corporation, incorporated in February of 1996 as "Carnival Brand Seafood Company."   (Def.'s Mot. Summ. J., Ex. 6.)   The record indicates that the Plaintiff existed as early as January of 1996, however.   (Pl.'s Resp., Decl. of Frank Asaro, Jul. 18, 1997, ¶ 1 (noting that he has served as president of the Plaintiff since that time).)   On October 1, 1996, Mariscos de Bahia, S.A. de C.V. ("Mariscos")

7

executed a corrected assignment[1] of its rights in the "Carnival" mark to the Plaintiff. Mariscos' common law rights[2] in the mark derived from the importation and sale in the United States of its highest quality shrimp under the "Carnival" mark since approximately 1980. (Def.'s Mot. Summ. J., Ex. 1, Aff. of Bernard S. Ludwig at 1-2; Ex. 2, Aff. of James B. Rukin at 1-2; Dep. of Bernard S. Ludwig at 9). The first indication that the Plaintiff actually began to operate and make use of the rights in the "Carnival" mark assigned to it by Mariscos[4] did not appear with the briefing of the

---

[1] On March 18, 1996, Mariscos assigned all of its rights in the "Carnival" mark to "Carnival Seafood Brands, Inc.," a non-existent Delaware corporation. (Def.'s Mot. Summ. J., Ex. 3.)

[2] The corrected assignment indicates that as of October, 1996, the "Carnival" mark was the subject of a pending trademark application before the U.S. Patent and Trademark Office. (Def.'s Mot. Summ. J., Ex. 3.)

[4] The Plaintiff also claims to derive rights in the "Carnival" mark from an April 17, 1997 assignment from Hi-Seas of Dulac, Inc. ("Hi-Seas") of that company's trademark registration for "Carnival!" as used in connection with "fresh frozen shrimp, cooked shrimp, breaded shrimp, cooked crawfish and breaded alligator." (Def.'s Mot. Summ. J., Exs. 4 and 11.) The Plaintiff received the assignment from Hi-Seas in settlement of a trademark infringement lawsuit brought in the United States District Court of the Southern District of Florida and a cancellation proceeding brought before the United States Patent and Trademark Office. Id. Allegedly, Hi-Seas had been selling raw shrimp of a lesser quality than Mariscos had been under the "Carnival" mark. (Def.'s Mot. Summ. J., Ex. 5.) Any rights received by the Plaintiff via the assignment are legally insignificant on the record as developed, however, because it indicates that Hi-Seas' rights to the mark extended back only to June 10, 1992, the date on which Hi-Seas filed its application for registration. See 15 U.S.C.A. § 1115(b)(5)(A). Having used the "Carnival" mark since 1990 in connection with the manufacture and sale of seafood gumbo

8

Defendant's motion but instead more than four (4) months later with the various declarations submitted with the Plaintiff's Motion for Preliminary Injunction on November 4, 1997.[5]

Prior to the filing of these declarations, the evidence showed that Frank Asaro is and has been the president of the Plaintiff since January of 1996, that the Plaintiff has had employees since Asaro became president and that as of July 18, 1997, the Plaintiff had ten (10) employees. (Asaro Decl., Jul. 18, 1997, ¶¶ 1, 9.) Asaro also indicated at that time that the Plaintiff is in the business of shipping "seafood products throughout the United States, in particular, in and through Florida." Id. ¶ 6. To the contrary, the Defendant submitted the deposition testimony of Captain Edward Fink, the attorney who incorporated the Plaintiff. (Def.'s Mot. Summ. J., Fink Dep. at 10.) Fink testified that as of November of 1996, the Delaware company had no employees, no bank account and that the address given for the company was his home

---

and chicken gumbo, the Defendant's rights in the mark are senior to those assigned by Hi-Seas to the Plaintiff.

[5] The Defendant's response to the Plaintiff's Motion for Preliminary Injunction is due on December 31, 1997.

9

address.  Id. at 10, 15.  By April of 1997, the Plaintiff
continued to indicate that it was doing business from Fink's
residence.  (Compl. ¶ 3.)  The only record evidence that the
Plaintiff actually began using the mark in any capacity is
found in the affidavit of Bernard S. Ludwig, President of
Ludwig Shrimp Company.  (Ludwig Aff. at 1.)  In sum, the
record as developed at the time of the briefing of the
Defendant's motion showed with respect to the Plaintiff's
"actual and continuous use" of the "Carnival" mark that the
Plaintiff did not exist until 1996, that it had no rights in
the "Carnival" mark until March or October of 1996 when it
received any and all of the common law rights in the mark held
by Mariscos and that the Plaintiff may or may not have
continuously engaged in the business of selling and shipping
"seafood products" throughout the United States under the mark
since the time of the assignment by Mariscos.  On November 4,
1997, however, the Plaintiff filed its Motion for Preliminary
Injunction with supporting declarations.  Those declarations
indicate that since at least September of 1997 the Plaintiff

has been selling retail-packaged microwaveable products, including plain frozen shrimp, bacon-wrapped BBQ shrimp, shrimp scampi, grouper, red snapper, Caribbean snapper marinated in lemon pepper sauce, mahi mahi fillets, yellow fin tuna, orange roughy, halibut, lobster tail and surf and turf (lobster tail and beef tenderloin). (Asaro Decl., Oct. 24, 1997, ¶¶ 2-3; Decl. of Shelly DeMotte, ¶¶ 2-3.)

**B.   Prior Use**

Despite the state of the record, the Court will assume that the Plaintiff has engaged in actual and continuous use of the "Carnival" mark since the 1996 assignment so that it may continue its consideration of the Defendant's motion.  As stated above, the Plaintiff may only establish use prior to that of the Defendant by reliance on the common law rights developed and assigned to it by Mariscos since it is undisputed in the record that the Defendant at minimum has sold seafood gumbo and chicken gumbo under the trade name "Carnival Brands" since 1990, having added additional products at the time of its incorporation in 1992.  (Def.'s Mot. Summ.

11

J., Aff. of Raymond Rathle, ¶¶ 4-6.)   The Defendant attacks such reliance, however, by contending that the assignment of rights from Mariscos to the Plaintiff was invalid as an assignment in gross.   The anti-assignment in gross rule prohibits "[a] sale of a trademark divorced from its good will."   J. Thomas McCarthy, 2 <u>McCarthy on Trademarks and Unfair Competition</u> § 18:3 (4th ed. 1997).   An assignment in gross occurs where an assignee uses the mark assigned without its attendant good will "in connection with a different business, a different good will and a different type of product."   <u>Id.</u>  The rule protects "the continuity of the thing symbolized by the assigned mark."   <u>Id.</u>   However, the rule "does not guarantee continuity, but only facilitates it," such as when a mark and its attendant good will are assigned and the assignee does not make the product of the assignor.   <u>Id.</u> § 18:10.   In this case, the record demonstrates that Mariscos assigned the mark and the good will associated with the mark to the Plaintiff.   (Def.'s Mot. Summ. J., Ex. 3.)   This assignment thus satisfied the anti-assignment in gross rule

12

regardless of whether or not the Plaintiff actually commenced use of the mark.[6]   Thus, any failure of continuity creates a failure of ownership or an abandonment rather than invalidation of the assignment.   J. McCarthy, § 17:14.   As stated above, the Court will assume for the purpose of its continued consideration of the Defendant's motion that the Plaintiff used the "Carnival" mark in aid of its sales after the October, 1996, assignment from Mariscos.

The Defendant also argues that the Plaintiff cannot show that it has used the "Carnival" mark in association with the sale of goods like those sold by the Defendant.   Further, the Defendant contends that the related goods doctrine does not act to extend any rights in the mark which the Plaintiff does have to the types of products sold by the Defendant.   It is

---

[6] If the evidence demonstrated that Mariscos continued to import shrimp to the United States under the "Carnival" mark after the assignment of the mark to the Plaintiff and it also showed that the Plaintiff began using the mark in association with a different type, quality, source, etc. of shrimp, then a situation involving violation of the rule would be present.   Unlike the facts present here, such facts would risk "fraud on the purchasing public, who reasonably assume that the mark signifies the same nature and quality of goods and services, whether used by one person or another."   J. McCarthy, § 18:3. The assignment in gross would render the transaction invalid.   However, as between the assignor and the assignee, the assignment would be binding for purposes of an infringement action brought by the assignee against the assignor.   Id. § 18:15 (citing Restatement (Third) of Unfair Competition § 34 cmt. b (Tentative Draft No. 3, 1991)).

undisputed that the rights transferred to the Plaintiff by Mariscos encompassed only the use of the "Carnival" mark in association with the import and sale of high-quality raw shrimp for distribution. The Defendant does not sell raw shrimp for distribution. Thus, having assumed for the purposes of the disposition of the Defendant's motion that the Plaintiff is the senior user of the "Carnival" mark insofar as the mark is used in the sale of high quality raw shrimp, the only question raised and still unconsidered by the Court is whether the products sold by the Defendant are <u>related</u> to the Plaintiff's noncompetitive raw shrimp product such that the Defendant's products "would reasonably be thought by the buying public to come from [the Plaintiff], or thought to be affiliated with, connected with, or sponsored by, [the Plaintiff].'" <u>Tally-Ho, Inc. v. Coast Community College Dist.</u>, 889 F.2d 1018, 1023 (11th Cir. 1989); J. McCarthy, § 24:6.[7] "'Related use' is merely a facet of the likelihood of confusion test and therefore requires an inquiry into seven

_____

[7] Put differently, the question is "whether the products are the kind the public attributes to a single source." <u>E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.</u>, 756 F.2d 1525, 1530 (11th Cir. 1985).

factors affecting the likelihood of confusion among consumers:
(1) type of trademark; (2) similarity of the two marks; (3)
similarity of [products]; (4) identity of customers and
facilities; (5) similarity of advertising; (6) intent of the
alleged infringer; and (7) actual confusion." <u>Tally-Ho</u>, 889
F.2d at 1027 (citing <u>Freedom Sav. and Loan Ass'n v. Way</u>, 757
F.2d 1176, 1182 (11th Cir. 1985)).    "These factors do not
operate in a mathematically precise formula; rather, we use
then at the summary judgment stage as a guide to determine
where a reasonable jury could find a likelihood of confusion."
<u>Duluth News-Tribune v. Mesabi Publishing Co.</u>, 84 F.3d 1093,
1096 (8th Cir. 1996).  "Of these factors, the type of mark and
the evidence of actual confusion are the most important in
this circuit" to the likelihood of confusion determination.
<u>Dieter v. B & H Indus. of S.W. Fla.</u>, 880 F.2d 322, 326 (11th
Cir. 1989) (citing <u>Freedom Sav.</u>, 757 F.2d at 1186).

With respect to the similarity of the goods or services
offered by the Plaintiff and the Defendant, the record showed
at the time of the briefing of Defendant's motion that

15

Mariscos only sold raw shrimp under the "Carnival" mark to the Ludwig Shrimp Company for distribution, and that the Plaintiff may have continued such sale after the assignment of Mariscos' common law rights in the mark.[8]   (Ludwig Dep. at 15.)   The Defendant, on the other hand, sells only prepared foods manufactured in New Orleans, Louisiana, such as seafood and chicken gumbo, and crawfish, lobster and shrimp cakes, in retail-type packaging and in food service quantities for restaurants. (Rathle Aff. ¶¶ 5, 7-8.)  Thus, it is undisputed that the Plaintiff and the Defendant sell distinct goods.

The evidence provided at the time of the original briefing of the Defendant's motion indicated that Mariscos had one customer, the distributor Ludwig Seafood Company, that Ludwig continued to distribute the Plaintiff's shrimp and that Ludwig resells the Plaintiff's goods to distributors,

---

[8] Although the Plaintiff produced declarations with its Motion for Preliminary Injunction which show that it has been in the business of selling retail-packaged microwaveable foods such as plain frozen shrimp, bacon-wrapped BBQ shrimp, shrimp scampi, grouper, red snapper, Caribbean snapper marinated in lemon pepper sauce, mahi mahi fillets, yellow fin tuna, orange roughy, halibut, lobster tail and surf and turf (lobster tail and beef tenderloin) since at least September of 1997, see Asaro Decl., Oct. 24, 1997, ¶¶ 2-3, such evidence is not probative on the issue of whether or not the Plaintiff is the senior user of the "Carnival" mark as it relates to the Defendant's goods.

wholesalers, processors, very few retailers, and a few restaurants. (Ludwig Dep. at 13, 15-16, 22, 55.) The Defendant, on the other hand, exclusively sells its prepared foods to retailers, such as restaurants and grocery stores. The record indicated at that time that there may be some overlap between customers of the Plaintiff and the Defendant. However, such overlap would be limited to a situation in which a grocery store purchased boxes of the Plaintiff's raw shrimp from Ludwig to sell in the fresh fish department and that same grocery store purchased the Defendant's prepackaged, prepared foods for resale to consumers in the frozen food department. This type of overlap is insignificant to the Count's likelihood of confusion analysis, in the absence of evidence which conflicts with the Defendant's characterization of its primary customers as consumers and not resellers of any kind.[9] (Rathle Aff. ¶¶ 7, 10, 13, 15.)

_____

[9] As stated at note 8 supra, the new evidence presented by the Plaintiff in its Motion for Preliminary Injunction which indicates that as of at least September of 1997 it began selling retail-packaged food sold ultimately to consumers through brokers and/or grocery stores, see Asaro Decl., Oct. 24, 1997, ¶ 2; Decl. of Jerome M. Lipshin, ¶ 4; DeMotte Decl. ¶ 3; Decl. of Joseph X. Dalton, ¶ 3, like the Defendant does, is not relevant to the priority issue.

"Actual confusion by a few customers is the best evidence of likelihood of confusion by many customers." <u>Freedom Savings</u>, 757 F.2d at 1185 (citing <u>Amstar Corp. v. Domino's Pizza, Inc.</u>, 615 F.2d 252, 263 (5th Cir. 1980)).  The only evidence of alleged actual confusion submitted to the Court at the time of the briefing of the Defendant's motion consisted of two (2) incidents.  The President of the Plaintiff, Frank Asaro stated that "[a]t the FMI/Show in Chicago in May, 1997, I was personally asked at least twice if we were the 'Carnival of New Orleans.'  (Asaro Decl., Jul. 18, 1997, ¶ 12.) Although in its response the Plaintiff characterizes the persons who questioned Asaro as customers of the Plaintiff, the record does not support this characterization.  (Pl.'s Resp. at 8.)  Furthermore, neither the record nor the Plaintiff's memorandum explains the nature of the "FMI/Show." Asaro also stated in his declaration that "when making a call at the main K-mart office in Indiana, we were confused with the other 'Carnival' and at first they would have nothing to do with us."  (Asaro Decl., Jul. 18, 1997, ¶ 13.)  It is not

further explained in the record why Asaro believes that K-mart employees confused the Plaintiff with the Defendant as opposed to any other company which has used the "Carnival" mark.[10] This evidence of "actual confusion" is insufficient to establish the existence of a genuine issue of material fact regarding likelihood of confusion.[11]   See, e.g., Woodsmith

---

[10] In an affidavit filed subsequent to Asaro's declaration, the Defendant's President, Raymond Rathle, Jr., responded by stating that "Kmart has never been a customer of mine, I have never approached Kmart about being a customer of mine, I have never sold any product to Kmart, and my understanding is that any confusion caused by Kmart is a result of High-Seas of Du Lac's business with Kmart."  (Def.'s Reply, Aff. of Raymond Rathle, Jr. ¶ 3.)  See also supra note 3.

[11] With its Motion for Preliminary Injunction, the Plaintiff has produced new instances of alleged actual confusion as to the source of the Plaintiff's goods.  In declarations submitted to the Court, the Plaintiff indicated that confusion resulted from the presence of both the Plaintiff and the Defendant at the San Francisco Seafood Show held September 9, 1997 to September 11, 1997.  (Asaro Decl., Oct. 24, 1997, ¶ 3; Decl. of Jerome Lipshin, ¶¶ 2-3; DeMotte Decl. ¶ 2; Decl. of Paula A. Mott, ¶¶ 2-3; Decl. of John H. Smith, ¶ 2; Dalton Decl. ¶ 5.)  Specifically, the Plaintiff indicated that the organizers of the show omitted the name of the Plaintiff's company from the directory of the show because when they saw both names printed together they thought the second name was a mistake.  (Asaro Decl., Oct. 24, 1997, ¶ 5; Dalton Decl. ¶ 8.)  One of the Plaintiff's employees, Shelly DeMotte, stated that when she arrived at the show to begin setting up the Plaintiff's booth, the information desk mistakenly directed her to the Defendant's booth.  (DeMotte Decl. ¶ 4.)  This evidence supports a finding of confusion on the part of the show organizers, not the Plaintiff's customers, however.  See also Smith Decl. ¶ 5.  The Plaintiff also indicated that potential customers, some of whom attended the show, were confused about the connection, or lack there of, between the Plaintiff and the Defendant.  (Asaro Decl., Oct. 24, 1997, ¶¶ 4, 7; Lipshin Decl. ¶¶ 4-5; DeMotte Decl. ¶ 5; Mott Decl. ¶ 4; Smith Decl. ¶ 4; Dalton Decl. ¶¶ 2, 4, 6.)  The only evidence of actual confusion among the Plaintiff's customers  was Asaro's statement that "two or three customers, apparently under the misimpression that [the Plaintiff] was distributing products that are actually products of [the Defendant], asked me whether those products were of consistent high quality" and employee Dalton's statement that he has "been asked by my contacts at

Publishing Co. v. Meredith Corp., 904 F.2d 1244, 1249 (8th
Cir. 1990) (noting that although "evidence of actual confusion
may be the best evidence of likelihood of confusion, it is not
conclusive of its existence").

The evidence with respect to similarity of the marks
shows that the Plaintiff uses the trade name "Carnival Brand
Seafood Co." and that in the past Mariscos used simply the
words "Carnival Brand" printed on the side of the boxes of the
highest quality of shrimp that it sold to Ludwig.[12]  (Ludwig
Aff. at 2; Ludwig Dep. at Ex. 2.)   The Defendant uses
"Carnival Brands, Inc." as its trade name and that name
appears on its products.   The word "Carnival" is also
integrated into the Defendant's products in that it sells
gourmet crawfish, crab and shrimp cakes under the "Carnival
Louisiana Premium" label and crawfish orléans, shrimp creole,

_____

several of [the Plaintiff's] customers if [Plaintiff] is affiliated with [the
Defendant]."  (Asaro Decl., Oct. 24, 1997, ¶ 4; Dalton Decl. ¶ 3.)  As the
Court stated at note 8 supra, however, evidence of confusion among the
companies which arose after the Plaintiff began to sell foods other than raw
shrimp is irrelevant to the question of priority of use.

[12] Although at this time the Plaintiff purports to sell retail-packaged
microwaveable foods, it has not produced any evidence which demonstrates what
type of packaging is used for such foods.  In any event, such packaging would
not be relevant to the issue before the Court.

alligator sauce piquante and chicken creole under the
"Carnival Cajun Classics" label. (Def.'s Mot. Summ. J., Exs.
9-10.)

The record indicated at the time of the original briefing
of the Defendant's motion that with respect to similarity of
advertising, the Plaintiff does no advertising other than to
ship its shrimp to Ludwig in containers bearing the mark
"Carnival" and to attend trade shows.[13]   (Rukin Aff. at 2.)
Instead, Ludwig itself promoted the Carnival name in an effort
to resell the Plaintiff's shrimp.   Id.; Ludwig Dep. at 33.
The Defendant advertises its products at trade shows, in
magazines and on television.

The strongest mark is that which can be classified as
"arbitrary or fanciful."   Marks created by combination of a
word in common usage to a service or product unrelated to its
meaning also fall into the arbitrary category.   See Freedom
Savings, 757 F.2d at 1182 n.5.   A weaker mark is the
"suggestive" mark.   This mark contains some description but

---

[13] With its Motion for Preliminary Injunction, the Plaintiff has not
indicated that it advertises its products other than at trade shows.

21

also requires some exercise of the imagination to connect the mark with the product it represents.   See Coach House Restaurant, 934 F.2d at 1560.   The weakest mark that can be protected under the trademark laws is the "descriptive" mark. This mark merely describes the general nature, quality or character of the services offered.   See   American Television & Communications Corp. v. American Communications & Television, Inc., 810 F.2d 1546, 1548 (11th Cir. 1987).   Unlike the fanciful and suggestive marks, the descriptive mark is only entitled to trademark protection if it has achieved "secondary meaning."   See Vision Center, 596 F.2d at 115.   See also Inwood Lab. Inc. v. Ives Lab. Inc., 456 U.S. 844, 851 n.11 (1982) (defining secondary meaning as having attached to a mark when "in the minds of the public, the primary significance . . . is to identify the source of the product rather than the product itself").   There is legal precedent for the finding that the Plaintiff's "Carnival" mark as used in connection with the sale of raw shrimp is arbitrary and therefore to be considered a strong mark.   See Blumenfeld Development Corp. v. Carnival Cruise Lines, Inc., 669 F. Supp. 1297, 1318 (E.D. Pa. 1987)

(finding "Carnival" mark meaningless as it relates to a cruise line and thus unique, arbitrary and strong for that type of service).

Finally, there is no evidence in the record with respect to the Defendant's intent other than that the Defendant chose the name Carnival in 1990 to evoke Mardi Gras and the identity between that festival and the city in which the Defendant's product is made, New Orleans, Louisiana. (Def.'s Mot. Summ. J., Rathle Aff. ¶ 3.) Construing all of the evidence in the record in the light most favorable to the Plaintiff and resolving all questions of fact in favor of the Plaintiff, the Court finds that the Plaintiff has failed to produce facts to support the confusion element of its trademark infringement claim.[14]  Further, this failure on the confusion element

---

[14] The relative strength of the Plaintiff's mark, without other evidence, is not sufficient to support a finding that a likelihood of confusion exists. See, e.g., Continental Motors Corp. v. Continental Aviation Corp., 375 F.2d 857, 861 (5th Cir. 1967) (stating that "whether a mark is regarded as 'strong' or 'weak', 'original, arbitrary, fanciful' or 'generic, descriptive, geographic' is but one of the elements to be considered in determining whether confusion is likely to result"); TV Land, L.P. v. Viacom Int'l, Inc., 908 F. Supp. 543, 550 (N.D. Ill. 1995) (stating that "[n]one of [the] factors by itself is dispositive of the likelihood of confusion question, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved") (quoting McGraw-Edison Co. v. Walt Disney Prods., 787 F.2d 1163, 1168 (7th Cir. 1986)).

mandates summary judgment for the Defendant on the Plaintiff's false designation of origin claim as well.   See, e.g., <u>Ross Bicycles, Inc. v. Cycles USA, Inc.</u>, 765 F.2d 1502, 1509 (11th Cir. 1985).

## IV.   CONCLUSION

In sum, the Plaintiff has failed to raise a question of fact on the issue of likelihood of consumer confusion as to the source of its raw shrimp product as opposed to the source of the Defendant's prepared foods.   As a result, judgment for the Defendant is appropriate on each of the Plaintiff's claims.   Based on the foregoing, it is hereby

**ORDERED AND ADJUDGED** that the Defendant's motion is **DENIED** insofar as it seeks the dismissal of this case.   It is further

**ORDERED AND ADJUDGED** that the Defendant's motion is **GRANTED** insofar as it seeks the entry of summary judgment on all of the claims of the Plaintiff's Complaint.   All other pending motions are **DENIED AS MOOT**, and the Clerk is directed to close this case forthwith.

**DONE AND ORDERED** in Chambers in Miami, Florida, this $\underline{31}$

day of December, 1997.

Joan A. Lenard
_____
JOAN A. LENARD
UNITED STATES DISTRICT JUDGE

cc:  Robert J. Sacco, Esq.
     Gregory L. Denes, Esq.

25